Herbert B. SMITH

v.

ATLANTIC RICHFIELD COMPANY.

Civ. A. No. 81–3635.

United States District Court,
E. D. Pennsylvania,
Civil Division.

Feb. 12, 1982.

Norman P. Zarwin, Robert P. Weiner, Philadelphia, Pa., for plaintiff.

Eugene M. FitzMaurice, Sara S. Augenbraun, Philadelphia, Pa., for defendant.

OPINION

EDWARD R. BECKER, Circuit Judge.*

## I. *Preliminary Statement*

It was only a matter of time until the video game rage gave rise to litigation. This case is before us in the wake of the termination by defendant Atlantic Richfield Company ("ARCO") of an agreement between it and plaintiff Herbert B. Smith for the operation of an "am/pm" convenience store in Wynnewood, Pennsylvania, because of plaintiff's failure to remove several coin-operated video games from the store's premises.[1] The convenience store is adjacent to an ARCO gasoline station operated by plaintiff under a separate lease. Plaintiff, relying upon the fact that these two operations are conducted on the same premises, has invoked the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. ("PMPA"), in an effort to enjoin the termination of the "am/pm" convenience store agreement. The PMPA provides that when a motor fuel franchisor terminates or fails to renew a motor fuel distribution franchise in any way inconsistent with the PMPA's procedural requirements, the franchisee may bring a civil action, without regard to the amount in controversy, in an appropriate federal district court. PMPA § 2805(a).

■ Contending that this case does not involve a franchise termination under the PMPA, Atlantic Richfield Company ["ARCO"] has moved to dismiss this case for lack of jurisdiction pursuant to F.R.

Civ.P. 12(b)(1). There being no other alleged federal jurisdictional basis for plaintiff's suit, our determination of the PMPA's scope will determine whether this case may be maintained in this court. The case presents us with a question of first impression concerning the scope of the jurisdictional provisions of the act: May the PMPA be applied to the termination of an agreement pertaining to a retail franchise operated on the same premises as a gasoline retail franchise, even though the termination impairs neither the gasoline station franchise nor the lease of the premises, including the right to operate a commercial or other kind of store without the franchise? We turn now to statement of the background facts and then to a discussion of our findings of fact and conclusions of law.[2] For the reasons that follow, we dismiss plaintiff's complaint for lack of jurisdiction.

## II. *The Factual Background*[3]

On November 25, 1977, the plaintiff entered into a lease and ancillary agreements with ARCO for the operation of a gasoline station and convenience store at Lancaster Pike and Wynnewood Road, in Wynnewood, Pennsylvania. This agreement was superseded when, on December 17, 1979, the parties entered into an "am/pm" Convenience Store Agreement and an "am/pm" Premises Lease with Addenda. The "am/pm" Convenience Store Agreement established plaintiff as a franchisee of ARCO's

---

* Of the United States Court of Appeals for the Third Circuit, sitting by designation. At the time the motions decided in this opinion were heard, Judge Becker was a Judge of the United States District Court for the Eastern District of Pennsylvania.

1. ARCO objects to the video games because it believes that the games will attract undesirable people to the store, thereby tarnishing ARCO's "am/pm" trademark and the image ARCO has built up through expensive advertising campaigns.

2. In passing upon the question of subject matter jurisdiction, factual determinations may be made by the court. *See, e.g., Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 892 (3d Cir. 1977); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1161,

1176 (E.D.Pa.1980). We need not be concerned that we might prematurely determine factual matters properly left to resolution at trial, because the jurisdictional and substantive issues in this case are sufficiently distinct that the jurisdictional determination is plainly within the province of the court. The substantive issues concerning whether ARCO has complied with the requirements of the PMPA for terminating a franchise, such as timely notice and termination only upon sanctioned grounds, are unrelated to the jurisdictional issue of whether this case involves the termination of a "franchise" as defined by the PMPA.

3. Unless we otherwise indicate, the recited facts are not in dispute.

"am/pm" trademark and convenience store marketing scheme.

Under the gasoline station agreement, rent on the gasoline station is paid separately from payments on the convenience store building made pursuant to the Convenience Store Agreement. Rent on the gasoline station facilities was set at a rate of two cents per gallon of fuel sold or otherwise delivered from the premises per month, provided that the minimum monthly rental payment is no less than $1,705.

Under the Convenience Store Agreement, if plaintiff operates the store 24 hours a day, he must pay a monthly royalty equal to 12% of gross sales, compensation, and commissions,[4] with a minimum monthly royalty of $1,732.[5] If plaintiff fails to keep the store open around the clock he must remit royalties based on 14% of gross sales.[6]

The Convenience Store Agreement and Premises Lease, although separate agreements, exhibit some degree of interrelation. If the Premises Lease terminates for any reason, then the Convenience Store Agreement also terminates. On the other hand, plaintiff can lose the Convenience Store Agreement but retain all his rights under the Premises Lease to operate a gasoline station and to put the store building to any use he chooses. In the event that the Convenience Store Agreement terminates, a rental schedule pertaining to the store building contained in the Premises Lease is substituted for the equivalent provisions in the Convenience Store Agreement. Under these substituted provisions, plaintiff's rental obligations for the store would be modified so that the monthly royalty payments would increase to 14% from 12% of gross sales; the minimum monthly rental payment, however, would drop from $1,732 to $1,558 per month.

In order to increase the revenue generated by his convenience store facility, plaintiff, in April 1981, installed two coin-operated electronic video game machines in the store. He has since added two more. These machines return about $200 per week, on which plaintiff has faithfully paid the 12% monthly royalty owed to ARCO. Plaintiff maintains that without the revenue generated by the video games he would be forced to close the convenience store. ARCO, however, disagrees and avers that most "am/pm" convenience stores operate profitably without video game receipts.

ARCO objects to the presence of these machines in the convenience store. ARCO sent three notices of its objection to plaintiff. These notices demanded removal of the machines and further stated that, under Article 6.02 of the Convenience Store Agreement, the machines' presence in the store placed plaintiff in default. Article 6.02 provides that the operator of an "am/pm" convenience store "may not install additional equipment, fixtures or machines" in the store without ARCO's prior written consent.

Plaintiff ignored ARCO's demands to remove the machines. Consequently, on August 13, 1981, ARCO notified plaintiff that the Convenience Store Agreement would be terminated as of September 16, 1981. Plaintiff promptly filed this suit, which alleges violation of the PMPA, and pleaded several pendent state law claims. Plaintiff also moved for a preliminary injunction under the PMPA against the termination of the Convenience Store Agreement.[7] Pro-

4. The plaintiff's pleadings use the 12% figure, even though the contract, which is attached to plaintiff's complaint, states an 11% figure. We shall rely on plaintiff's complaint to the extent that it conflicts with the contract.

5. Because of the market pressures on the gasoline retail industry, ARCO has been accepting a minimum monthly payment of $800. ARCO's counsel has assured the plaintiff and the court that that minimum monthly payment schedule will not be affected by this litigation or by ARCO's decision to terminate the Convenience

Store Agreement, and that it will continue as long as warranted by market conditions.

6. The "am/pm" Premises Lease reestablished plaintiff as tenant to the gasoline distribution and convenience store facilities.

7. PMPA § 2805(b)(1) empowers a federal district court to preliminarily enjoin a franchise termination if the franchisee shows that his franchise has been terminated; if there "exists sufficiently serious questions going to the mer-

ceedings on this motion were delayed when ARCO postponed termination of the Convenience Store Agreement while the parties attempted to negotiate a settlement. Those conciliatory efforts have proven to be fruitless and the litigation is now being actively pursued.

As we have explained, ARCO has moved that plaintiff's suit be dismissed for lack of federal jurisdiction. ARCO claims that the jurisdictional provisions of the PMPA are inapplicable to this litigation because the subject matter of plaintiff's complaint involves not the termination of a motor fuel franchise, to which the PMPA applies, but only the termination of a trademark and convenience store franchise, which is not covered by the PMPA. The material facts are uncontested. The only factual dispute stems from plaintiff's assertion that it would be physically and economically impossible to operate the gasoline station franchise without the benefit of the "am/pm" convenience store agreement. ARCO denies this. As is explained in the following section of this memorandum, we also believe this assertion to be without foundation and, at all events, not material to the result.

Having recited the facts as stated in plaintiff's complaint, we turn now to address the novel issue of what constitutes a franchise termination under the PMPA.

## III. *Discussion*

The PMPA on its face is clearly limited in scope to terminations of motor fuel franchises. The text of the PMPA does not contain any provision justifying an extension of the Act to cover such things as a convenience store franchise. Those provisions relevant to the definition of "franchise" pointedly speak only of aspects of motor fuel franchises.[8] Obviously, plaintiff cannot rely solely upon the plain meaning of the PMPA to support his contention that the Act provides his suit with a federal jurisdictional foundation.

Plaintiff, however, contends that the Convenience Store Agreement and the Premises Lease are so intertwined and interdependent as to constitute one franchise, so that termination of the Convenience Store Agreement amounts to termination of the Premises Lease, thereby bringing this case under the PMPA. He observes, on one hand, that if the Premises Lease terminates, so does the Convenience Store Agreement. On the other hand, he points out that while the Premises Lease will survive termination of the Convenience Store Agreement, the Premises Lease's dormant provision for rental payments on the store will become operative, whereupon his royalty payments under the Premises Lease as a percentage of gross sales will be greater than what he was required to pay under the Convenience Store Agreement. Plaintiff argues that the purpose of this provision is not to increase ARCO's revenues, but to force termination of the motor fuel franchise while circumventing the PMPA's procedures.

Plaintiff also argues that it would be physically and economically impossible for the motor fuel franchise to continue to operate after the convenience store franchise had been terminated. Plaintiff maintains that the convenience store and motor fuel operations are completely integrated and

---

its to make such questions a fair ground for litigation;" and if the balance of hardships favors the franchisee's petition.

**8.** For instance, under the PMPA, the term "franchise" means any contract

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

PMPA § 2801(1)(A). Also, the term "franchise relationship" means "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." PMPA § 2801(2). Lastly, the term "franchisee" means "a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." PMPA § 2801(4).

that the motor fuel operation is controlled by equipment located in the convenience store. His economic impossibility argument appears to be that the gasoline retail operation would be unprofitable without being complemented by a convenience store bearing the trappings of the "am/pm" marketing scheme. Plaintiff concedes, however, that termination of the Convenience Store Agreement will not deprive him either of the lease to the store or the motor fuel distributing facilities. He also concedes that he may continue to operate a convenience store operation on the premises, without use of the "am/pm" trademark and marketing embellishments.

Plaintiff contends that the previously described physical and economic interrelationships suffice to bring termination of the Convenience Store Agreement under the PMPA because Congress intended that the scope of the definition of "franchise" would be broad enough to preclude circumvention of the PMPA's strictures by termination of secondary arrangements. To support his broad reading of the PMPA, plaintiff emphasizes a portion of the legislative history contained in a Senate Report which provides:

> The term "franchise" is defined in terms of a motor fuel trademark license. It should be noted that the term is applicable only to the use of a trademark which is owned or controlled by a refiner. Secondary arrangements, such as leases of real property or motor fuel supply agreements are incorporated in the definition of a franchise. Therefore, the substantive provisions of the title, relating to the termination of a franchise or nonrenewal of the franchise relationship, may not be circumvented by termination or nonrenewal termination or nonrenewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless.

Sen.Rep.No. 95–731, 75th Cong., 2d Sess., *reprinted in* [1978] *U.S. Code, Cong. & Ad. News* 873, 888.

Defendant, on the other hand, emphasizes the next sentence from this portion of the legislative history:

The broader definition, however, is not intended to encompass other contractual arrangements which may exist between a franchisor and a franchisee, *e.g.*, credit card arrangements, contracts relating to financing of equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories.

*Id.* In ARCO's view, although the legislative history indicates that Congress contemplated a broader definition of "franchise" than is evidenced by the PMPA on its face, the Act, when read in its entirety, still does not cover termination of the Convenience Store Agreement. According to ARCO, only secondary arrangements essential to the operation of a motor fuel franchise are covered by the PMPA, and the Convenience Store Agreement, in contrast to such undertakings as a property lease or a motor fuel supply agreement, is not an essential secondary arrangement.

█ We agree with ARCO's reading of the legislative history and its assessment of the import of the Convenience Store Agreement to plaintiff's motor fuel retail operation. The legislative history cited to us indicates merely that the PMPA may not be circumvented by terminating secondary arrangements essential to the operation of the motor fuel franchise. It does not indicate that all secondary arrangements are covered. The critical question is whether the Convenience Store Agreement is essential to plaintiff's motor fuel franchise.

█ We conclude that plaintiff's arguments as to the physical and economic interrelationship between the two business operations are without merit. It is clear as a matter of law that the Convenience Store Agreement is not a secondary arrangement essential to the operation of the motor fuel franchise. Termination of the Convenience Store Agreement therefore, does not constitute termination of the motor fuel franchise and consequently we have no jurisdiction over this case. Plaintiff's physical dependence argument is simply untenable. Termination of the Convenience Store Agreement means only that plaintiff will lose the right

to use the "am/pm" trademark and the equipment and services supplied by ARCO in connection with its "am/pm" franchising operations. Plaintiff will not lose the use of the premises nor the equipment necessary for the sale of motor fuel. Plaintiff's conclusory allegations notwithstanding, termination of the Convenience Store Agreement will neither physically preclude nor inhibit continued operation of the motor fuel franchise.[9]

 Plaintiff's economic interdependence argument is likewise meritless. Plaintiff asserts that increased payments under the Premises Lease will make it impossible for him to continue to operate the store. We find such assertion baseless and of no legal effect.[10] It is, of course, questionable whether plaintiff's obligations will indeed increase significantly.[11] But even if plaintiffs' obligations increase, plaintiff conceded at oral argument that the economic pressures which would force it out of business are not attributable to ARCO, but are merely the same economic pressures faced by every gasoline retailer. Moreover, regardless of plaintiff's lament about his commercial fortunes, ARCO is not an insurer of plaintiff's business, but merely its franchisor.

It is also important to note that plaintiff does not assert that ARCO is attempting to use the competitive pressures which buffet plaintiff's business as a means of destroying his motor fuel franchise. It would be difficult to make such an assertion in view of the fact that ARCO, in recognition of the adverse market conditions in the gasoline retailing industry, has voluntarily been accepting and will continue to accept a minimum rent far below what ARCO could rightfully demand under the Premises Lease.

In sum, plaintiff's claim that termination of the "am/pm" franchise constitutes the termination of a "franchise" under the PMPA on grounds of physical and economic interdependence is factually and legally insufficient to defeat ARCO's motion. Even if Congress did intend the PMPA to recognize instances of physical and economic interdependence, Congress only intended the act to apply to essential secondary arrangements and the "am/pm" Convenience Store Agreement was not a secondary agreement essential to plaintiff's motor fuel franchise.

For the foregoing reasons, plaintiff's complaint is dismissed for lack of jurisdiction.

9. To the extent that these conclusions may not be justified as a matter of law, we find them as facts, see n.2, supra.

10. See n.9 supra.

11. Although plaintiff's royalty payments will increase to 14% from 12% of monthly gross sales, under the Convenience Store Agreement he may be required to make a minimum monthly payment of $1,732.00, whereas the Premises Lease requires a minimum monthly payment of only $1,555 per month.